IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Committed Intimate Relationship of: | No. 88028-4-I |
| Karen D. Allston, | DIVISION ONE |
| Respondent, | UNPUBLISHED OPINION |
| and | |
| Michael M. Pollock, | |
| Appellant. | |

COBURN, J. — Michael Pollock appeals the trial court's property distribution order following the termination of his 12-year-long committed intimate relationship (CIR) with Karen Allston. Pollock contends that the trial court erred by not considering the parties' oral agreement to keep their finances separate and by characterizing his previously separately owned property on Bainbridge Island as community property.[1] We disagree and affirm the trial court's division of the parties' community-like property. However, we agree with Pollock that the trial court abused its discretion in awarding an equitable $100,000 reimbursement to Allston from the sale proceeds of Pollock's separately owned house in Seattle. Accordingly, we affirm in part, reverse in part, and remand for

_____

[1] Though "community property" definitionally does not exist outside of a marriage, courts refer to property acquired during a CIR as community property because such property is "characterized in a similar manner as income and property acquired during marriage." Connell v. Francisco, 127 Wn.2d 339, 351, 898 P.2d 831 (1995).

entry of a corrected judgment.

FACTS

Allston and Pollock were in a CIR from 2009 to 2021.[2] The parties lived together throughout the duration of their CIR, starting in June 2009 when Allston moved into Pollock's previously purchased house at 8701 NW 19th Avenue[3] in Seattle.[4] Around 2011 the parties moved together to Bainbridge Island where they remained living together until the end of their CIR in July 2021. This same month Allston petitioned the trial court for a distribution of the parties' community-like property. The case went to a bench trial that spanned six days in fall 2023.

At trial Allston testified that when the parties lived together in the Seattle house, she helped with the house mortgage payments and other expenses. Additionally, she financially contributed to and worked on improvement projects on the house, including cleaning up and putting in new plants in the garden. Allston testified to assisting with a renovation of the basement by limewashing the walls. She also helped Pollock with installing hardwood in the living room and vinyl flooring in the bedroom, as well as helping to lay and grout tiles in the kitchen. Additionally, Allston testified she purchased and helped Pollock to install two new windows in the dining room. Allston did not present any testimony as to the value of the work she did related to the Seattle house or whether that work contributed to any increased value of the house.

---

[2] Pollock disputed the existence of a CIR at trial but concedes on appeal that the parties were in a CIR.

[3] Because the court's findings and conclusions vary as to the street address of the house, we defer to the street address that is both used in Pollock's briefing and in parts of the court's order.

[4] A second house in Seattle also was part of the property distribution. Only the house at 8701 NW 19th Avenue is at issue in this appeal, which we generally refer to as the Seattle house.

As to finances, Allston testified that the parties had a joint bank account during their relationship to which the parties each committed to contributing a monthly amount of $4,000. However, the actual amount deposited varied. When asked if the parties had an agreement that all their other income would remain their separate property, Allston answered, "No, not exactly; not specifically." Allston explained that the purpose of the joint account was "[t]o make it easy to have a pot of money to withdraw for joint household expenses, pet expenses, food, dining out, things we did together."

After the parties moved from the Seattle house to Bainbridge Island, both parties testified that Pollock used the joint account to pay for the Seattle house mortgage for four months in 2017. Allston testified that the payments were $2,219.76.[5] In spring 2021, before the end of the CIR, Pollock sold the Seattle house and kept the proceeds of $373,472 in a separate investment account.

Allston testified that she was aware Pollock owned the Bainbridge Island property when the parties began dating. Pollock showed her the property because he wanted her to invest with him in building a house on the property. As the parties' relationship progressed, Allston decided it was a good investment.

Allston stated that Pollock "had a land loan [on the Bainbridge Island property] that he told me he had a balloon payment due that he could not pay. So he termed my contribution to helping him pay that off and putting a house on the [Bainbridge Island] property as an investment." Allston also testified that Pollock

> was working with the bank to try to refinance, et cetera, et cetera. And so shortly after that, he mentioned that he was trying to put a … modular home on the [Bainbridge Island] property. And he was worried that the land loan was going to be due and he didn't have the money to cover that,

---

[5] One payment was $2,249.76, which Allston testified included a late fee.

3

so he really needed help investing in building a house, so he didn't lose his property.

The parties designed a modular home together for the Bainbridge Island property. Allston made a down payment of $34,379 for the construction of the modular home on the property. Allston also obtained a construction loan with Pollock for the property. Both parties were subject to the loan and both parties' names were on the construction deed of trust. The bank was unwilling, however, to grant the construction loan to the parties unless Allston had an interest in the property.

Pollock testified that he did not want to give Allston an interest in the Bainbridge Island property. Allston testified that on the day that the parties had to file a quitclaim deed to add Allston to the title for the Bainbridge Island property, Pollock "was very angry and said he decided he didn't want to do it." Allston explained:

> [Pollock] was not happy. He felt like [the Bainbridge Island property] was his property and he shouldn't have to, you know, share it with me in order to build a house on it. And the bank told him that's not correct. I said, I'm not going to invest in something to build a house with you if I have no skin in the game. This is, you know, my investment as well.

Allston testified she would not have moved forward with the investment in the Bainbridge Island property if Pollock had not signed the quitclaim deed. Allston was asked:

> Q. Did you make that clear to him?
> A. I did. In fact, he expressed some frustration that he was having to give me half his property in order to make this transaction work. And I said, that's fine. Let's not do it. I don't have to contribute. You can do whatever you want with the property. I'm going to find a house to live in with my pets.
> …
> I was in no hurry to move to Bainbridge. It's not like I begged him to, you know, build this house with him. He's the one who asked me to build the house.

4

Ultimately, Pollock decided to sign the quitclaim deed. Allston explained that Pollock changed his mind

because he was going to lose that land. He couldn't pay the balloon payment that was due [on the land loan], so he would have ended up with nothing if he had not signed that – not quitclaim-deeded me the property in order for us to build on that land.

On the language of the quitclaim deed, the court heard testimony from both parties that Allston recommended to Pollock that they consider a joint tenancy with right of survivorship. Pollock testified that the bank simply required Allston to be added to the title as a condition of the loan and did not otherwise require the quitclaim deed to include language regarding a joint tenancy with right of survivorship. Rather, if Allston died, she did not want to be in a position of sharing a house with Pollock's seven siblings. Pollock testified that he agreed to the right of survivorship language, telling Allston, "Okay, that's fine. You know, I get hit by a truck, it's yours. Because [Allston] did not want to be in a position where they would kick her out of the house. That was the purpose of it." Allston stated that Pollock also wanted to avoid sharing the property with Allston's family who would otherwise potentially inherit Allston's interest in the property if Allston died.

Additionally, the court heard testimony from Pollock that during the time Allston made a downpayment on the modular home and he signed the quitclaim deed, the parties' relationship was "working out well." The parties discussed moving to the Bainbridge Island property and "coming together" as a couple long-term. Pollock was asked:

Q. … Now, were these talks kind of going along simultaneously when you two were, you know, when the money was put down for the

modular home and you were doing this quitclaim deed? Was this all kind of simultaneous together?

 A. Well, yeah. I mean, the design of the house – I mean, it was the happy, We're going to design a house and we're going to live in it and have a happy life …. And I thought we were going to get married. So, yeah, all that was going on.

Pollock testified that the parties intended to design the modular house, live in it together, and have a happy life. Pollock thought that, even though Allston told Pollock she did not want to get married by the time the quitclaim deed was executed, "a door was being left open for [marriage]."

The trial court admitted the quitclaim deed into evidence during trial. Recorded in June 2010, the deed states:

> THE GRANTOR, Michael Moritz Pollock … conveys and quit claims an undivided one-half interest to Karen Dawn Allston, to be held in joint tenancy with a right of survivorship, … together with all after acquired title of the grantor[s] herein.

Pollock testified that he recalled signing the quitclaim deed and read what he was signing. Allston estimated construction of the modular home began around July 2010, and the parties moved into the home the following year.

In 2017, Allston testified she refinanced the mortgage on the Bainbridge Island property to remove Pollock's name at his request. Allston took on the full obligation of the mortgage to allow Pollock to refinance the Seattle house "to get a better rate." Allston explained, "[T]he only way he could [do] that, because of his credit, was if I assumed the full mortgage."

After trial, the court issued its oral ruling in December and issued its final division of property and final order dissolving the CIR in January 2024. We include here the written findings of fact relevant to this appeal.

6

In support of its determination that the parties were in a CIR, the trial court included Finding 4.4., "Pooling of Resources and Services for Joint Projects." The court found that "the parties pooled their money together to build" the modular house on the Bainbridge Island property. The court also found under Finding 4.4 in part:

> The parties maintained more than one joint back account and had joint credit cards, they purchased items together and jointly made improvements to the [house on the Bainbridge Island property]. Ms. Allston paid half the mortgage and helped with expenses when they lived at [the Seattle house]. She maintained and improved the garden, and painted inside the house and helped with purchasing new windows. Ms. Allston dealt with and discussed the building plans for [the house on the Bainbridge Island property] with the architect as much as Mr. Pollock did and often emailed him separately when Mr. Pollock was out of town. Mr. Pollock emailed Ms. Allston about the financial benefits of the two of them investing in [the Bainbridge Island property] and the [Seattle] home. Ms. Allston contributed $34,379 on a downpayment on [the Bainbridge Island property]. Both of the parties' names were on the construction loan and construction deed of trust. Ms. Allston helped pay for the permits and agreed to help build the home at [the Bainbridge Island property] if Mr. Pollock agreed to give her half interest in the land. He reluctantly agreed and signed a quitclaim deed in … 2010 giving here an undivided one half interest in joint tenancy with right of survivorship. He was unable to afford to build the home without her financial assistance and credit. She helped pay for improvements to the home [on the Bainbridge Island property] including decking, landscaping, etc. … The parties commingled their finances often, paying for community items with funds from their separate accounts and paying for separate items with funds from their joint account. For example, Ms. Allston paid her father's taxes from the joint account and Mr. Pollock bought the Toyota Tundra with funds from his individual account. Mr. Pollock also wrote a check to his mother from the joint account. These are just some examples of the commingling. All of the accounts appear to have been used interchangeably, and the accounts they considered "separate" contained their paychecks which were community property funds.

The trial court found that the Seattle house was Pollock's separate property. The court generally designated the proceeds from the sale of the Seattle house as Pollock's separate property. However, the court determined that the sale proceeds were subject to an equitable right of reimbursement. Under Finding 9.5, titled "Community Right of

Reimbursement for Contribution to [the Seattle house]," the court determined that "Allston has an equitable right of reimbursement of $100,000 for her contributions to [the Seattle house] property during the [CIR]." The court awarded Pollock the sale proceeds of the Seattle house, $373,472, minus the $100,000 that the court awarded Allston in equitable reimbursement. The court stated:

> [F]inding [9.5] is based on the following facts: … Allston moved into the home in 2009 and lived there until 2011 when the parties moved to Bainbridge Island.[] Pollock was able to refinance this [Seattle house] property during the relationship due to[] Allston's agreement and ability to refinance the [Bainbridge Island] property into her name only. This greatly improved[] Pollock's credit and ability to get loans. []Allston contributed to improvements to the [Seattle house] property and payments on the mortgage after they moved to Bainbridge did come from the joint account. Due to the commingling and poor record keeping previously mentioned,[6] payments from []Pollock's individual account(s) toward the mortgage would have been with community funds from his paychecks. Even though []Pollock had renters, the rental income was sporadic so there is no evidence to support that separate property income covered the expenses.

The court concluded that the equitable reimbursement award of $100,000 to Allston was fair, just, and equitable.

Under [F]inding 9.1, the trial court concluded that the Bainbridge Island property was community property. The court acknowledged that because Pollock purchased the property in 2000 before the parties' CIR began, it was presumed to be his separate property. However, the court determined that Pollock's execution of the quitclaim deed in July 2010 granting Allston "an undivided one half interest in joint tenancy with right of survivorship" defeated this presumption by "effectuat[ing] a transmutation of separate property to community property." The court also observed under Finding 9.1, "There is no question the [modular] home is community property," stating:

---

[6] This appears to reference the above-quoted trial court's findings related to commingling under Finding 4.4.

> Allston helped purchase [the modular home], and refinance it after the relationship began in 2009. [The parties] jointly improved the house spending thousands on landscaping, decking, plants, and furniture. … Ms. Allston paid $34,000 on the modular home and [the parties] were both on the construction loan and construction deed of trust. The land loan of $178,000 was rolled into the construction loan, so the mortgage payments [the parties] made together were also on the underlying land and the house together. Mr. Pollock would not have been able to build the house on that property without Ms. Allston's assistance.

As part of its determination to divide the community assets and debts equally between the parties, the trial court awarded the Bainbridge Island property to Allston.

Pollock appeals.

## DISCUSSION

### Legal Principles

A CIR is a stable and marital-like relationship during which the parties cohabit with the shared knowledge that a lawful marriage between them does not exist. Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). The distribution of property from a CIR requires a three-step analysis. In re Marriage of Pennington, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). The trial court must first determine whether a CIR exists. Id. If such a relationship exists, the trial court evaluates the interest each party has in the property acquired during the relationship. Id. Lastly, the court makes a just and equitable distribution of the community-like property. Id. The critical focus in distributing property between parties upon the dissolution of a CIR is to identify what would have been characterized as community property if the parties were married and to prevent the unjust enrichment of one party at the expense of the other. Id.; Connell, 127 Wn.2d at 349.

9

Generally, we review a trial court's property distribution order at the end of a CIR for abuse of discretion. Morgan v. Briney, 200 Wn. App. 380, 387, 403 P.3d 86 (2017) (citing Soltero v. Wimer, 159 Wn.2d 428, 433, 150 P.3d 552 (2007)). A trial court abuses its discretion if it bases its decision on untenable grounds or untenable reasons. Byerley v. Cail, 183 Wn. App. 677, 685, 334 P.3d 108 (2014). We review a trial court's findings of fact for substantial evidence and conclusions of law de novo. Morgan, 200 Wn. App. at 387 (citing Soltero, 159 Wn.2d at 433). Substantial evidence exists where there is "'a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true.'" In re Custody of A.T., 11 Wn. App. 2d 156, 162, 451 P.3d 1132 (2019) (quoting Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003)). We will not disturb a trial court's finding of fact that is supported by substantial evidence even if there is conflicting evidence. Burrill v. Burrill, 113 Wn. App. 863, 865, 56 P.3d 993 (2002). We defer to the trial court's weighing of evidence and witness credibility determinations. Muridan v. Redl, 3 Wn. App. 2d 44, 55, 413 P.3d 1072 (2018). Unchallenged findings of fact are verities on appeal. A.T., 11 Wn. App. 2d at 163.

Division of Community-Like Property

*A. Oral Agreement*

Challenging the trial court's Finding 4.4, Pollock contends that the trial court erred by not determining whether there was an enforceable oral agreement between the parties to keep their finances separate apart from the parties' joint account that they used to equally share household expenses. Altogether, Pollock argues, the trial court

failed to analyze whether the terms of the purportedly binding agreement were breached to warrant remedy. We disagree.

In a marriage dissolution, all separate and community property is before the trial court for distribution. Lindemann v. Lindemann, 92 Wn. App. 64, 68-69, 960 P.2d 966 (1998). This rule does not apply in a CIR. Id. at 69. Instead, our Supreme Court has held that to avoid equating cohabitation with marriage, a trial court may only distribute the property that the parties acquired through efforts contributed during the relationship. Connell, 127 Wn.2d at 350. Thus, only the parties' community-like property is subject to distribution, and separate property is not before the trial court for distribution in a CIR case. Lindemann, 92 Wn. App. at 69.

Parties in a CIR, like spouses, may change the character of their community-like property to separate property by entering into mutual agreements. In re Parentage of G.W.-F., 170 Wn. App. 631, 638, 285 P.3d 208 (2012). Such agreements may be oral or written. Id. The party who seeks to enforce an oral agreement changing the nature of the property accumulated during a CIR must show by clear and convincing evidence both (1) the existence of the agreement and (2) that the parties jointly observed the terms of the agreement throughout the CIR. Id. (citing In re Marriage of Mueller, 140 Wn. App. 498, 505, 167 P.3d 568 (2007)). Because oral agreements are particularly difficult to prove, "'courts will overturn an oral property agreement if the parties do not consistently adhere to the agreement during their [relationship].'" Id. (alteration in original) (quoting Mueller, 140 Wn. App. at 505). "Thus, to enforce an oral agreement changing the nature of the property accumulated during the committed intimate

11

relationship, a court must find that an oral agreement existed and that it was observed throughout the relationship." Id.

In the instant case, Pollock's counsel asserted at opening that, except for a joint account that the parties set up to cover household and mortgage expenses, the parties had an oral agreement to keep their finances separate. This oral agreement ostensibly encompassed, for example, the parties' retirement accounts and investments. Counsel indicated that the oral agreement should control the trial court's characterization of the parties' respective property to "keep[] everything separate."

The trial court's written findings and conclusions do not state whether the court determined whether an oral agreement between the parties existed. However, as part of its conclusion that the parties were in a CIR, which Pollock does not dispute on appeal, the court found that the parties "often" commingled their finances under Finding 4.4. The trial court concluded that the parties pooled resources and services for joint projects, finding that the parties:

> pa[id] for community items with funds from their separate accounts and pa[id] for separate items with funds from their joint account. For example, Ms. Allston paid her father's taxes from the joint account and Mr. Pollock bought the Toyota Tundra with funds from his individual account. Mr. Pollock also wrote a check to his mother from the joint account. These are just some examples of the commingling. All of the accounts appear to have been used interchangeably, and the accounts they considered "separate" contained their paychecks which were community property funds.

Pollock concedes that "the parties did not religiously adhere to their oral contract." Nonetheless, Pollock argues that "[a]ny commingling resulted in great efforts to trace/un-commingle those finances" in accordance with their oral agreement. He claims that the trial court's rejection of the parties' oral agreement to keep their finances

12

separate was based on the incorrect finding that the parties did not follow the agreement throughout their CIR and allowed Pollock's personal and "un-commingled" accounts to be subject to division.

In its oral ruling, the court discussed its finding that the parties pooled their resources and services for joint projects and stated that

> [d]espite [the parties'] efforts – they said they intended to keep their finances separate, they failed miserably and co-mingled finances left and right. They borrowed funds from the joint accounts to pay personal expenses.

 (Emphasis added.) The court continued:

> I find the joint accounting was messy and not purely for community – and not purely used for community purposes, that neither were their single or separate accounts. They would use them interchangeably. They were on an honor system to reimburse the joint account, but the Court is not satisfied that that was done in order to keep them separate.
> …
> So the Court also finds that the oral agreement they had to keep their finances separate was invalid, and they didn't follow it.

(Emphasis added.) Later, in its discussion of findings pertaining to the characterization of property, the court stated that it

> already indicated that the Court does not find the oral agreement to keep their finances separate binding or valid … simply because they didn't follow it because of the co-mingling. The Court finds that they did not act in accordance with their supposed agreement during their relationship.

(Emphasis added.)

Pollock asserts that these emphasized portions of the oral ruling indicate that the court implicitly found that an oral agreement existed, which thereby compelled the court to find whether the agreement was enforceable to properly identify what of the parties' property was subject to community distribution.

13

However, to prove an enforceable oral agreement, it was Pollock's burden to establish not only that he and Allston agreed to keep their finances separate, but that he and Allston consistently honored that agreement throughout their CIR. G.W.-F., 170 Wn. App. at 638. By referring to the parties' "supposed" oral agreement as both "invalid" and not "binding," the trial court's oral ruling may have been an inartful explanation of this two-step test.  Regardless, it is apparent from the record that, even assuming the parties had an oral agreement, the court was not persuaded that the parties consistently followed the agreement to render it enforceable in the context of a CIR community-like property distribution. We must interpret the trial court's silence in its written order on this material issue of fact against Pollock as the party who bears the burden of proof to show that the parties had an enforceable oral agreement. Crane & Crane, Inc. v. C & D Elec., Inc., 37 Wn. App. 560, 570, 683 P.2d 1103 (1984).

Here, the record contains substantial evidence that the parties did not consistently abide by an oral agreement to keep their finances separate throughout the duration of their CIR. See Puget Sound Nat. Bank v. St. Paul Fire & Marine Ins. Co., 32 Wn. App. 32, 42, 645 P.2d 1122 (1982).

Pollock does not dispute the trial court's findings that describe "some examples" of the parties' commingling of finances, including findings that Pollock purchased the community's Toyota Tundra with funds from his separate account and that both parties used money from their joint account to assist their parents.

Additionally, Allston's testimony supports a finding that the creation of the joint account was for logistical convenience and that the parties did not consistently keep their finances separate. When asked whether the parties had an oral agreement to only

contribute to a joint account and otherwise keep their finances separate, Allston answered, "I wouldn't say it was that precise. It was an understanding that the joint account would primarily be used for joint couple expenses, eating out; food; our phones; our car expenses; the pets, for sure; and our utilities; and our mortgage." Allston testified that she and Pollock did not have a specific agreement that their income would remain their separate property. Allston paid for various things for the community from her separate account. According to Allston, there were multiple times that the parties did not have enough funds in their joint account to pay the mortgage, so either she or Pollock would transfer their own funds. The parties' individual contributions to the joint account were "not always equal." Allston also stated that the parties "often intermingled our separate property with our joint property. We bought things for each other using joint, using separate. It wasn't as clear-cut as, this is separate; this is joint; this is separate."

In his briefing, Pollock cites to Exhibit 104 as evidence of the parties' "good faith effort" to abide by their oral agreement. The trial court admitted Exhibit 104, which consisted of a spreadsheet summary of deposits into and withdrawals from the parties' joint account starting in August 2015. Pollock offered the spreadsheet at trial as evidence that the parties made efforts to use the joint account for shared expenses so they could otherwise segregate their personal funds in their individual accounts according to their oral agreement. Pollock testified that the parties used the spreadsheet to summarize bank statements to help ensure the parties were putting in roughly equal amounts and to track activity with the joint account so that they could shore up the account when it was used for personal expenses or to determine when money needed

15

to be withdrawn from the account to reimburse a party for an overpayment. For example, Pollock testified that if he or Allston made a joint purchase from their separate account, they would then write a check from the joint account to their separate account. The trial court, however, was not persuaded by the spreadsheet, referring to it in its oral ruling as "not particularly helpful" because it was "inaccurate in many respects"[7] and "only started from 2015, so it ignored the prior four years that [the parties] were together."

Because the record supports that Pollock did not carry his burden to establish an enforceable oral agreement, we conclude the trial court did not err.[8]

B. *Transmutation of Bainbridge Island Property*

Challenging the trial court's Finding 9.1, Pollock contends that the court erred by characterizing the Bainbridge Island property as community property. We disagree.

A "court's characterization of property is a mixed question of law and fact." In re Marriage of Watanabe, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). We review the characterization of property de novo as a question of law. Id. at 348-49. We review factual findings in support of the characterization for substantial evidence, such as "time of acquisition, method of acquisition, and intent of the donor." Id. at 348.

Though marital community property rules do not directly apply to CIR dissolution proceedings, courts may look to such laws for guidance and apply them in CIR cases. Muridan, 3 Wn. App. 2d at 56 n.4; G.W.-F., 170 Wn. App. at 637. "[U]pon the demise of

---

[7] After being questioned about discrepancies regarding various transactions, Pollock agreed that his spreadsheet was inaccurate.

[8] Because we leave the weighing of conflicting evidence to the trier of fact, Pollock's reliance on additional testimony in the record as support for his assertion that the parties' financial activity in "totality" was consistent with their oral agreement is unpersuasive. Quinn v. Cherry Lane Auto Plaza, Inc., 153 Wn. App. 710, 717, 225 P.3d 266 (2009).

… [a CIR], the characterization of property as separate and community will apply by analogy even though in the absence of a marriage there is by definition no true community property." Lindemann, 92 Wn. App. at 68-69 (citing Connell, 127 Wn.2d at 350-51).

"If property is separate property as of the date of acquisition, it will remain separate property through all of its changes and transitions as long as it can be traced and identified." Watanabe, 199 Wn.2d at 351. Once the separate character of the property at issue is established, a presumption arises that it remains separate property absent direct and positive evidence showing that the owner intended to transmute or convert the property from separate to community property. Id.; In re Est. of Borghi, 167 Wn.2d 480, 484-85, 219 P.3d 932 (2009) (plurality opinion) (citing Guye v. Guye, 63 Wash. 340, 349, 352, 115 P. 731 (1911)). In other words, there must be sufficient evidence of the owner's intent to "change the character" of the separate property to property that is for the benefit of the community. Borghi, 167 Wn.2d at 484-85; see, e.g., Graves v. Columbia Underwriters, 93 Wash. 196, 198-99, 160 P. 436 (1916) (holding that wife did not convert separate property to community property by adding husband to mortgage based on request of loan company because borrowed money was not "devoted to a community use" but "solely for the purpose of preserving the wife's separate property from loss under tax foreclosure"). "Separate property remains separate 'unless, by the voluntary act of the spouse owning it, its nature is changed.'" Borghi, 167 Wn.2d at 485 (quoting Guye, 63 Wash. at 349).

Here, it is not disputed that Pollock acquired the Bainbridge Island property before the start of the CIR, thereby creating a presumption of separate property. He

maintains that he never intended to transmute the property to community property and claims that the trial court improperly rested its determination of transmutation on the fact that Pollock quitclaimed an interest in the Bainbridge Island property to Allston. Relying on the Supreme Court's decisions in Borghi, 167 Wn.2d 480, and Watanabe, 199 Wn.2d at 351, Pollock argues that evidence showing Pollock signed a quitclaim deed giving Allston an undivided one-half interest in joint tenancy with the right of survivorship is not sufficient to defeat the presumption that the Bainbridge Island property is Pollock's separate property.[9]

Pollock overstates the Supreme Court's holding in Borghi by suggesting that an owner's execution of a quitclaim deed categorically cannot establish intent of transmutation. In Borghi, the court held that a third party's inclusion of the owner's husband on a special warranty deed did not show whether the owner had intended to transmute her separate property into community property prior to her death. 167 Wn.2d at 482-85, 490-91. The Borghi court observed that "[w]ith respect to real property, a spouse may execute a quitclaim deed transferring the property to the community, join in a valid community property agreement, or otherwise in writing evidence his or her intent [to transmute separate property into community property]." Id. at 488-89. Though, in absence of such evidence of intent, a change in the name or names in which the title is held "tells us nothing or is ambiguous at best." Id. at 489. In Borghi, there was no

---

[9] Pollock does not seem to dispute the trial court's finding that the house the parties built on the Bainbridge Island property is community property. Instead, in his reply brief, Pollock argues that the modular home improved the Bainbridge Island property. He thus argues that Allston has not rebutted the presumption that the property on which the modular home sits is Pollock's separate property.

evidence as to why the third party included the husband's name on the special warranty deed. Id.

Consistent with Borghi, Washington courts have held that a quitclaim deed or other method of property conveyance executed by the owning spouse can be sufficient evidence to demonstrate the owner's intent to transmute separate property to community property. See, e.g., Volz v. Zang, 113 Wash. 378, 383, 194 P. 409 (1920) (stating that "separate property may be changed by a proper conveyance or agreement into community property"); In re Marriage of Groves, 10 Wn. App. 2d 249, 253, 255, 260-61, 447 P.3d 643 (2019) (holding that trial court erred by not applying community property agreement that required equal division of separate property to husband's disability allowance). Thus, though our Supreme Court has observed that "'[t]here are many reasons it may make good business sense for spouses to create joint title that have nothing to do with any intent to create community property,'" "'a spouse may [nonetheless] execute a quitclaim deed transferring the property to the community.'" Watanabe, 199 Wn.2d at 352 (quoting Borghi, 167 Wn.2d at 488-89) (citing Volz, 113 Wash. at 383; Guye, 63 Wash. at 353).

In Watanabe, Pedersen inherited a 50 percent interest in property in Arlington, Washington, that was later used to finance the purchase of a second property. 199 Wn.2d at 345-46. Because Pedersen did not have credit to obtain financing, the loan company required the addition of her husband Watanabe to the Arlington property's title. Id. at 346. Pedersen quitclaimed her interest in the Arlington property to herself and Watanabe "to establish community property." Id. at 351 (internal quotation marks omitted). The Supreme Court determined that evidence supported the trial court's

finding that Pedersen did not intend to convert the Arlington property to community property, including "the fact that the deed was drafted by the lender, Pedersen's testimony that she had no recollection of signing the deed and did not have anyone explain what signing would entail, and the loan company's requirement that Watanabe be added to the title." Id. at 352 & n.4. The court held that because Pedersen presented an alternative reason for including Watanabe on the title—that the title company required Watanabe to be on the deed—Watanabe did not meet his burden to show that Pedersen intended to convert her separate Arlington property to community property. Id. at 354.

Unlike in Borghi, Pollock, as he concedes in his briefing, executed the quitclaim deed and not a third party. Consistent with Borghi, this writing is evidence of intent. 167 Wn.2d at 488-89; see also id. at 484-85 (citing Guye, 63 Wash. at 352). Distinct from Watanabe, Pollock remembers signing the quitclaim deed and read what he signed.

Importantly, though both parties testified that the loan company required Allston's name on the deed, the trial court also heard testimony from Allston that Pollock understood prior to signing the deed that its execution would grant her an interest in the property in exchange for her assistance with the construction of the modular home. The modular home was not an investment for only Pollock's benefit, but a mutually understood joint investment for the parties and their future together. Pollock testified that at the time that Allston made a downpayment on the modular home and he signed the quitclaim deed, the parties intended to design the house and live in it together. Pollock had hope at the time that the parties would eventually marry. As the trial court found and Pollock does not dispute, "Pollock would not have been able to build the

[modular] house on th[e] [Bainbridge Island] property without Ms. Allston's assistance." Therefore, on balance there is substantial evidence that Pollock did not merely add Allston's name on the deed to obtain financing for the property but that he intended to "change the character" of the Bainbridge Island property from his own property to a property and home that he and Allston could enjoy together as committed intimate partners. Borghi, 167 Wn.2d at 484-85.

The undisputed fact that Pollock was reluctant to join title with Allston on the Bainbridge Island property does not negate the evidence that he carried out the conveyance with intention, knowledge, and of his own free will.[10] Cf. Watanabe, 199 Wn.2d at 352 & n.4 (internal quotation marks omitted) (holding that facts supported the trial court's finding that wife did not intend to transmute her separate property into community property, such as her lack of knowledge regarding signing quitclaim deed that expressly conveyed property to herself and husband "to establish community property"). Because we defer to the trial court's credibility determinations and weighing of conflicting evidence, Pollock's purported evidence to the contrary is not persuasive. In re Marriage of Black, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017).

Moreover, the quitclaim deed did not merely include Allston's name but granted "an undivided one-half interest" to Allston "to be held in joint tenancy with a right of survivorship." (Emphasis added.) In the context of a conveyance, property transforms

---

[10] Pollock does not, for example, argue that he signed the quitclaim deed under duress or undue influence. The lack of evidence otherwise distinguishes this case from our sister division's decision in In re Marriage of Marzetta, which Pollock cites in his opening brief. See 129 Wn. App. 607, 620, 120 P.3d 75 (2005), abrogated on other grounds by, McCausland v. McCausland, 159 Wn.2d 607, 152 P.3d 1013 (2007)). In Marzetta, the court rejected the husband's claim to the asserted community property on the basis that the wife did not quitclaim the property to the husband "with knowledge of the nature of the transfers." Id.

from separate to community property "'when the parties intend such a change to take place and evidence this intention by a conveyance conforming in all essentials to the requirements of the law affecting the transfer of real property.'" Watanabe, 199 Wn.2d at 352 (second emphasis added) (quoting Volz, 113 Wash. at 384).

Here, the trial court observed in its challenged Finding 9.1 that Pollock conveyed an undivided half interest of the Bainbridge Island property to Allston as a "joint tenancy with [a] right of survivorship." The record shows that the bank did not require this particular form of conveyance as a condition for the loan. Rather, Allston and Pollock intentionally added this language to the deed to avoid future entanglement with the other's family regarding ownership of the property in the event the other party died. Pollock testified he understood the "right of survivorship" language as protecting Allston from being evicted by his family from the modular house if he died. Thus, Pollock's conveyance to Allston of an undivided half-interest in the property in the form of a joint tenancy with a right of survivorship further demonstrates his intent to change the character of the Bainbridge Island property for community use.

Because substantial evidence supports the trial court's determination that the separate property presumption was overcome, the trial court did not abuse its discretion in characterizing the Bainbridge Island as community property subject to distribution.

### Equitable Reimbursement

Pollock contends that the trial court arbitrarily awarded $100,000 as an equitable reimbursement to Allston from the sale proceeds for Pollock's separately owned house

in Seattle.[11] Because the record does not provide evidence to enable the court's conclusion that Allston was entitled to an equitable reimbursement award of $100,000 for community contributions to the Seattle house, we agree with Pollock and conclude that this award must be stricken.

An increase in value in a party's separate property is presumed to be separate property. Lindemann, 92 Wn. App. at 69 (citing In re Marriage of Elam, 97 Wn.2d 811, 816, 650 P.2d 213 (1982)). However, the non-owning party may be equitably entitled to reimbursement for community contributions that caused the increase in value. Id. at 70 (citing Elam, 97 Wn.2d at 816-17; Connell, 127 Wn.2d at 351). "[I]f the court is persuaded by direct and positive evidence that the increase in value of separate property is attributable to community labor or funds, the community may be equitably entitled to reimbursement for the contributions that caused the increase in value." Id. (citing Elam, 97 Wn.2d at 816-17; Connell, 127 Wn.2d at 351) (emphasis added). The mere efforts of a party to maintain a home do not give rise to a right of reimbursement. In re Marriage of Johnson, 28 Wn. App. 574, 579, 625 P.2d 720 (1981). The party alleging a right to reimbursement carries the burden of showing by clear and convincing evidence both (1) that community contributions create an underlying right to reimbursement and (2) the amount of reimbursement that the party is so entitled. See 19 ELIZABETH A. TURNER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 11:37 (2d ed. 2015); Elam, 97 Wn.2d at 816-17. Clear and convincing evidence exists when "'the ultimate fact in issue is shown by the evidence to be highly probable.'" In re

---

[11] As to this issue, Pollock assigns error to the trial court's Findings 9.5 and 10.1 in the trial court's Findings and Conclusions about the CIR and Findings and Conclusions 8 and 9 in the court's Final Dissolution Order.

Dependency of A.N.C., 24 Wn. App. 2d 408, 414, 520 P.3d 500 (2022), review denied, 1 Wn.3d 1012, 532 P.3d 1024 (2023) (internal quotation marks omitted) (quoting In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995)). When such a factual finding is appealed, this court must consider whether there is substantial evidence to support the finding and whether there is substantial evidence to satisfy the "highly probable" test. In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973).

Here, the trial court's finding that Allston was entitled to $100,000 for community contributions is not supported by evidence to satisfy this test. The trial court found that Allston made community contributions to the Seattle house in the form of labor and funds for improvement projects and assistance with mortgage payments for the house after the parties moved to Bainbridge Island. However, the court's written orders do not point to evidence to establish that the value of the Seattle house increased as a result of these contributions or to evidence that supports that the contributions were valued at an amount close to $100,000. See In re Marriage of Pearson-Maines, 70 Wn. App. 860, 869, 855 P.2d 1210 (1993).

Though a trial court may determine the value of community contributions by determining a reasonable wage or assessing the resulting increase in value, this quantification of the reimbursement must be within the scope of evidence. Id. (citing Harry M. Cross, The Community Property Law, 61 WASH. L. REV. 13, 71 (1986)); In re Marriage of Soriano, 31 Wn. App. 432, 436-37, 643 P.2d 450 (1982); see Elam, 97 Wn.2d at 817. A trial court abuses its discretion where it assigns value to property that is not within the scope of evidence. Soriano, 31 Wn. App. at 436-37; see also In re Marriage of Rockwell, 141 Wn. App. 235, 250, 170 P.3d 572 (2007) (stating that when

24

parties offer conflicting evidence as to property value in a property division dispute, a court may adopt either asserted value or any value in between).

At trial Allston did not present a theory at opening or closing for how much she should be reimbursed for any ostensible community contributions to the Seattle house. In response to Pollock's argument on appeal that the $100,000 award was arbitrary, Allston fails to cite to anything in the record that comes close to supporting a reimbursement award of $100,000.[12]

The trial court's written orders do not provide a basis for how the court determined that the reimbursable amount was $100,000. See Pearson-Maines, 70 Wn. App. at 869. In its discussion of the characterization of different assets at oral ruling, the court observed that Allston made contributions to the house, including "windows, painting, flooring, [and] landscaping."[13] The court stated, "Unfortunately, the Court was not provided any documentation to show how much she paid for those items." In regard to the amount of the equitable reimbursement award, the court stated, "And regarding the right of reimbursement, again, I didn't have sums, so I'm trying to – the Court is making an equitable determination and giving her a right of reimbursement of $100,000

---

[12] At oral argument Allston, without supporting cites to the record, asserted for the first time on appeal that the court properly based the $100,000 reimbursement award on Allston's share of 10 years of mortgage payments on the Seattle house made with community funds after the parties moved out of the house through the end of the CIR. Wash. Ct. of Appeals oral arg., Allston v. Pollock, No. 88028-4-I (July 23, 2025), at 09 min., 27 sec. through 12 min., 06 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071129/. We do not consider further this new argument that was not made in the response brief. RAP 10.3(b); see RAP 10.3(a)(6).

[13] An appellate court may look to a trial court's oral ruling to interpret its written order when not inconsistent with the written order. Wallace Real Est. Inv. Inc., v. Groves, 72 Wn. App. 759, 770, 868 P.2d 149 (1994).

for the [Seattle] home." When asked by Pollock's counsel how the court "came up to $100,000 reimbursement," the following exchange occurred:

> THE COURT: Again, I had to use an equitable figure. I figured [Allston's] contributions in the time that she – it's based on my – what I think is fair given the entirety of their relationship.
> …
> There was testimony that there was sporadic rent on the [Seattle] house. [Allston] lived there for two years before. And so community funds during their CIR were used to pay for the mortgage on the [Seattle] house. [Allston] contributed to the landscaping, the other items I mentioned. So I did my best to come up with a figure the Court felt was fair under all the circumstances.
> [Pollock's counsel]: So that 100,000 is what the Court is saying [Allston] should be reimbursed for her efforts and money put into the [Seattle house]?
> THE COURT: Correct.

We note as a matter of law that the court's reference to mortgage payments made with community funds during the two years that Allston lived at the Seattle house cannot constitute reimbursable community contributions. An equitable right to reimbursement may not arise upon the termination of a CIR if the contributing party received a reciprocal benefit through use and enjoyment of the separately owned property. Lindemann, 92 Wn. App. at 74 (citing Connell, 127 Wn.2d at 351; In re Marriage of Miracle, 101 Wn.2d 137, 139, 675 P.2d 1229 (1984)). "In that case, equity will find that the contributing spouse has already been reimbursed." Miracle, 101 Wn.2d at 139 (citing Harry M. Cross, The Community Property Law in Washington, 49 WASH. L. REV. 729, 777 n.220, 779 (1974)).

Principally, the trial court seemed to conflate the determination of the reimbursement award with its overall determination of a fair and equitable property distribution between the parties. A generalized assessment of what is "fair" in the context of the CIR is not sufficient to overcome the presumption of separate property in

26

considering a right to reimbursement. As the party alleging a right to equitable reimbursement, Allston has the burden to show that the specific valuation of the requested compensation existed within the scope of evidence. Such evidence is not apparent from the record before us. We therefore conclude that the trial court's reimbursement award of $100,000 is not supported by the record and constitutes an abuse of discretion.

Pollock concedes that the trial court's error in its treatment of his separate property does not affect the court's overall distribution of the parties' community-like assets and debts. Wash. Ct. of Appeals oral arg., Allston v. Pollock, No. 88028-4-I (July 23, 2025), at 6 min., 41 sec. through 7 min., 11 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025071129/. Accordingly, we strike the equitable reimbursement award and remand for the court to enter a corrected judgment consistent with this opinion.

CONCLUSION

We affirm the trial court's division of the parties' community-like property, including the court's award of the Bainbridge Island property to Allston. However, we reverse the trial court's award of an equitable reimbursement to Allston from the sale proceeds of Pollock's separately owned Seattle house. Thus, we remand for entry of a new judgment consistent with this opinion.

Coburn, J.

WE CONCUR:

Díaz, J.

Birk, J.

27